Last case on this morning's docket is Oldfield v. Trupiano Mr. Holmes, you're up first, counsel. May it please the court, counsel, my name is Brent Holmes, and I am privileged to represent the plaintiff, Mary Ann Oldfield, in this appeal. I want to first address the issue of the refusal of the trial court to give the IPI 5.01 Missing Witness Instruction, and the Illinois Supreme Court in Taylor v. Coley made a straightforward, no ambiguity rule, because we have cases where expert witnesses are retained. In this case, the plaintiff retained an expert witness who testified, Dr. Arthur Kramer. The defendants retained expert witnesses, Paul Lunsford, certified architect, who did not testify, and Charles Grunlow, an engineer and a surveyor, who did testify. The Illinois Supreme Court in the Taylor case basically said this, each party will retain experts, and of course, as discovery unfolds in a case, depositions are taken, inevitably, you learn that your expert, who you think maybe was just perfect, when you read his report, you find out that that expert comes with warrants. The Illinois Supreme Court indicated that if a party who has retained an expert witness makes a determination that that expert will not be called by that party at the trial, to avoid the missing witness instruction, that party must give reasonable notice in advance of the withdrawal or abandonment of that witness. How does one abandon the witness? Very simple. You simply tell, you could file, I did this recently in a case that I got bitten, you file a notice with the court and you say, plaintiff hereby withdraws expert John Doe as a witness in this case. You could do it verbally, you could, you know, in terms of the timing of this case, you could have simply told the court, we have decided, we've made a strategy decision, we're not going to call this expert. Could it have been abandoned by the fact that, let's say, a motion to limit is filed and that's granted, prohibiting the majority of the witness's testimony? Let me explain that, speak to that, because this witness was never abandoned. Yes, there was a motion to eliminate, part of that was granted because this witness was, as part of his opinions, as part of the basis for his opinions, he was going, or he was going to get up and tell the jury that the defendants have not violated any code provisions, and therefore this is a safe entrance. Did the defendant's counsel inform the jury that this witness was going to testify? Absolutely. This witness was listed on the jury veneer. The court in the jury veneer says, here are the list of witnesses who are going to be testifying in this case. Paul Lunsford is one of the witnesses. Absolutely. Did the defendant's counsel in the opening statements make that claim also? You know, that was the thought that I had ten minutes ago. I haven't recently read the transcript on the opening statement, so I don't know for sure what he said in the opening statement. What I can assure the court, and what is absolutely clear, is that Paul Lunsford was a retained expert witness for the defendants. After the ruling on the motion to eliminate, there was no withdrawal of this expert, no indication to the court, to me as adverse counsel, that this witness was not going to testify. We come to trial the next day. Du Bois Deer, his name is spread on record that he's going to be one of the witnesses. Before the obligation to say, I withdraw the witness, comes up, a decision has to be made that you're not going to call the witness. Do you agree with that? Is there anything, do you agree with that? Well. I mean, is that what the Supreme Court case says? If you decide you're not going to call the witness, then you withdraw, and then the missing witness instruction doesn't go in. But my question is this. What is there in the record that tells us that the defendant made a decision not to call the witness before Vardeer or any of those times? No. That is a false premise because the Illinois Supreme Court opinion basically says if the burden is on the party that has control of the expert witness, and that burden is this. If you are not going to call that witness, you must give reasonable notice in advance of trial of your intention not to call it. Just a minute. Just a minute. Stop. That presumes that a decision has been made not to call the witness. But if he's sitting in his countenance, I'm going to see how the plaintiff's experts go. I'm going to see how the evidence goes in. You know, I've got him on the phone. I can get him here in 12 hours or whatever. What if that's the situation? And how do we know from the record it wasn't is my question. Justice Stewart, that is a good question. And the Illinois Supreme Court, I believe when you read the Taylor case, has answered that question unequivocally. Assume this. We are not going to engage in any after-the-fact self-serving excuses or giving some reason why I didn't call this witness at the trial. We're not going to engage in that after-the-fact questioning and let's come up with some excuses. The Illinois Supreme Court said no, that's not the rule. That is your witness. You have the obligation. You are the master of your case. You can decide what kind of strategy you're going to engage in. But if it turns out that your strategy was that at some point, at some point, we don't know where and we're not going to have to inquire when you made the decision not to call your expert witness. But if you don't call that expert witness and you haven't given the other side reasonable notice in advance of trial of your intention, of your election, not to call the witness, then upon tender, the other party shall have the right to give the missing witness instruction. It is a clear, bright-line rule. And if there are going to be any exceptions made to that bright-line rule, then it's for the Illinois Supreme Court to make that preference. Not for a trial judge to say, well, I'm not going to follow this rule for this reason. It wouldn't be good enough for opposing counsel to say, you know, as Judge Stewart talked about, I'm going to wait and see how this case unfolds. I may not need to call my expert. That wouldn't be a good enough notice for me. Absolutely not. Absolutely not. Because here I'm calling my expert witness, Dr. Kramer, and, of course, he's getting defense counsel getting his licks in on it. How much are you being paid to testify? And isn't it true you didn't go see the site? And isn't it true you know this, that, and the other? And I would – Is there a requirement that the party not calling the witness must show a reasonable excuse for not calling that witness? There's not – I don't believe the Illinois Supreme Court even gets to that point because otherwise then we're going to be going into some kind of an ad hoc, after the fact, self-serving try to explain, well, why didn't you give notice? Why didn't you withdraw this witness? Why didn't you do this? Why didn't you do that? The Illinois Supreme Court said, no. We have this broad line rule. This is your witness. You retained him. You are smart enough, and you are the master of your case and the strategy, and you can decide a reasonable time before trial whether you are, in fact, going to call this witness or not. And if you decide – if you do not call the witness, then the other side is entitled to the missing witness instruction. Regardless of what the excuse is? Well, if the witness died, I think you could – I think that would be an excuse. But you don't have the after-the-fact inquiry and self-serving explanations and say, well, you know, I really thought I should have the right to see how this plays out. How well did Dr. Kramer do? Did I really – So you don't think that by granting your motion and limiting, restricting, presumably, the scope of this testimony would have any bearing on this? If that strategy is the decision that enough of his testimony has been removed from consideration by the jury, then you make that decision and you say, I'm not going to call. And you give the other side notice. But you can't just lay in the weeds. And more than that, we give our list of witnesses to the court and say, here's who we're going to call as witnesses. The court says, yes, of course, you've disclosed these people. We're going to inquire the jury. Do you know any of these people, et cetera, et cetera? I go through my whole case assuming, quite rightly, that Paul Lunsford is going to be called as a witness. I mean, I have a right to know that in terms of my own trial strategy and how I lay out my evidence and how I could frame what I would expect my witnesses to say and how I might want to change the strategy and the presentation of my evidence if it turns out that Mr. Lunsford isn't going to be called. It would make no difference to you if the court had stricken nine out of the ten opinions that the witness was going to give in this case? No, it doesn't, because it's not my burden. It's the other side's burden. It's his witness. And, in fact, after the judge wrote on the motion of limine and he did cut out all of this witness's testimony, what the court did was took out a couple of the bases because the bases were totally inappropriate. This witness was going to mislead the jury in testifying that one of the reasons that he claimed that this entranceway to this restaurant that had been open for only five weeks and had undergone a major renovation, that the reason it was safe was because it didn't violate any code provisions. Well, that was totally misleading because the city of Altamont doesn't have, they've never adopted any building codes. So that was totally misleading. And the other basis, another basis for his testimony was, well, I drive up and down the roads and I've been in other towns and I've seen other buildings and it looks similar to what I've seen, so I think if other people are doing it, it's safe. Those are the only two things that the court struck. There were other bases and his opinions with regard to his belief that the entrance was safe. That wasn't stricken. He was fully going to be allowed and presumably prepared to testify to those opinions. He also was critical of Dr. Kramer's opinion with regard to the claim that this was a poorly designed and laid out entrance. This is a bright line rule by the Illinois Supreme Court. If that rule is to be changed or if there are going to be any exceptions to the rule, it is not for the trial court to do that. It is for the Illinois Supreme Court to do that. This is a fundamental right the parties of the Illinois Supreme Court recognize and make that bright line rule so that there is no wiggle room or room for doubt with regard to this. I also have asserted as heir the court restricting my cross-examination of the expert witness called by the defendant, who did testify, Charles Cromwell, registered engineer and surveyor. He was hired to review the steps in the entrance, survey, take measurements with regard to the location of the steps, the heights of the treads and the risers. Of course, this witness comes with certain rewards also because in the discovery deposition, I'm able to obtain from him his opinion that from his many years of experience in designing steps, that it is important from a safety standpoint that these steps be of equal or equal height and that not doing that would implicate that it would be an unsafe condition. The court prevented me from cross-examining him by that. I wasn't going to raise any ADA codes or any codes at all, but this was an opinion that he had based at least in part on his years of experience. And again, we have cases, even defense counsel cited cases, that the widest latitude is to be given with regard to cross-examination of an expert because we're searching for the truth. Part of the truth here is that these risers of substantially uneven height do create an unsafe condition, and this expert knew that, and I was prepared to have him testify to that, but I was improperly barred from doing that. Getting on to the next issue with regard to my expert, Dr. Arthur Cramer. As counsel says in his brief, the widest latitude of cross-examination is to be permitted, but it has to be fair cross-examination, and Defendant's Exhibit 6 was not fair cross-examination. He works at the Beckman Institute of the University of Illinois. He now is the director, but he wasn't the director, had nothing to do with the construction of Beckman Institute or the design or construction of any of the stairs, and they trot out a picture, Defendant's Exhibit 6, which is showing one of the facades of the Beckman Institute with steps, no handrails, absolutely no similarity of circumstances. He had no control over any of that, and he's being cross-examined by all that. Of course, could draw the interest for the jury that, hey, this expert has something to do with Beckman. He works there, and you look at this. He's saying these steps in front of Joe's Pizza aren't safe because, for one thing, it doesn't have any handrails, and yet here we are at the place he works, and they don't have any handrails. That was an unfair cross-examination. There was no similarity of condition. He had nothing to do with it. It was a totally different situation. That should never have come out at any time during that cross-examination, and the court allowed that. And then to compound the error, then when we attempted to rehabilitate him on redirect examination to explain, now, wait a minute, it's there. Can you explain, well, why isn't there a handrail there? Well, because on the east side of our building, which is the main entrance, just like Joe's Pizza, the main entrance, the only entrance for the public, the main entrance, you don't need handrails because it's designed in such a way that you simply walk or there's a slight ramp, so you don't even need the handrails. But he wasn't even permitted to explain that, to attempt to rehabilitate him with regard to this photograph. And then the other issue we pointed out with regard to Dr. Cramer, and that was the improper attempted cross-examination by using a learned treatise. Now, there's a proper way to do things, and there's an improper way to do things. This was completely improper. In no way was there ever any foundation laid for this attempted cross-examination. A learned treatise or a publication, if you have the document, you mark it, you either draw attention to it and have the witness acknowledge its authenticity or the court take judicial notice or another witness testifies authoritative. And then from the publication itself, once now we all know what publication you're talking about, then you can cross-examine the witness and read from a specific paragraph or portion of it so that all counsel can see it, the court can look at it and see if there is in fact the publication that the witness in fact was aware of, that this is the same publication. Secondly, whether the quotation is an accurate quotation that's being stated. Thirdly, whether it's being taken out of context or not. None of that was done. It is starting to say, well, do you agree with this statement? And there was a question, you know, that falls people often happen because they're familiar with the location. And do you agree, you know, the Canadian housing and mortgage, there's nothing in this record, nothing that was provided to us before to even begin to determine that there's a foundation for this cross-examination. That was, again, prejudicial to our case. It simply was not done appropriately, not even an effort to do it appropriately. I've also raised the issue in the case that this is a case in which the verdict of the jury is against the manifest weight of the evidence. The resolved breach is an unreasonable resolve. If you look at the plaintiffs' exhibits 19 through 25, the nine-time photographs, they tell you about all you need to know. Even the other photographs showing that the door to the other business right adjacent to this has a handle there. Look at the photographs with regard to the substantially uneven risers. The defendant did not attempt to take any photographs of this building at night. And the only evidence that the defendants can point to to say that the jury's verdict was reasonable is their self-serving testimony that they believe it was adequately lit. The physical evidence, however, shows absolutely the opposite. And if I might draw an analogy, a person in a car pulls up to a stop sign at a rural intersection, unobstructed view each direction. The person says, well, I looked, and there wasn't anything. Tell me, I pulled out, bam. You cannot claim that you didn't see what would have been clearly visible had you looked. And like here, you can't claim that this restaurant is adequately and well lit when the physical evidence shows absolutely the opposite. Thank you. Afternoon, Your Honors. May it please the Court, Shane Carnot on behalf of the defendants. The plaintiff fell at a restaurant and the jury rendered a defense verdict. The trial court's denial of the plaintiff's motion for a new trial was within the court's discretion. As such, this awful court should affirm. Since plaintiff's counsel didn't go through a lot of the facts, I'd like to start out with just a brief nutshell of some of the facts from the background. The plaintiff went to this restaurant to pick up an order that she called them. She was 56 years old. She weighed over 200 pounds. She previously had a knee replacement. She had been on an experimental drug. She had diabetes. She had a chronic wasting disease and weakness in bringing up her foot at the time that she went to my client's restaurant. She told the jury that she had never had a foot drop before, and her own doctor said exactly the opposite. They said that she had muscular dystrophy, in his words, a drop foot complication. This was at the time that she comes to my client's restaurant to pick up her order. She also told the jury that she knew she had to be very careful because of her health problems that she had. She said that she doesn't take stairs if there's no handrail because of her preexisting conditions and her knee issues and all of the issues that she had. She doesn't take steps if there's no handrail. Obviously, there was no handrail at issue here. She walks up the steps in her Dr. Scholl's shoes without any problem. She made no complaints while she was inside. She didn't tell my clients, hey, you guys need to put up a handrail out there. She didn't say, I'm having trouble seeing. She didn't ask for help to get out. She picks up the food. She turns around with her purse and her food, goes back down the exact same steps that she just went up, and she fell. She says that she hit her heel on one of the steps. The plaintiff has raised several issues. I'll try to cover each one of those. The only one that wasn't argued is the seventh issue about sympathy, and so I intend to skip over that issue. It is important that each of these issues is evaluated under the very deferential abuse of discretion standard. The first issue, the plaintiff contends that a finding for a defendant in a case where a plaintiff falls downstairs is against the manifest weight of the evidence. That's the first issue that the plaintiff raises. The facts that I've already said in this couple minutes is sufficient for a jury to render a verdict in favor of the defendant. The things that I've already gone over. The plaintiff says she doesn't take steps without a handrail because of her condition. Her human factors expert, the guy from the U of I that comes down at a couple hundred bucks an hour to testify, says to the jury one of the reasons that she fell was her physical condition. That was a cause of the accident. Her doctor even said she's got chronic inflammatory demyelinating polyneuropathy, and she had a foot drop problem, and she tells the jury, well, her foot hit the step when she was leaving. So that's sufficient for the jury to render a defense verdict. The jury did not hear anything about post. The jury didn't hear that when you have eight inches of steps, you have to have a handrail. Was there a contributory negligence claim? Your Honor, I should know that, but I'm not positive. Well, I'm just wondering if the jury instructions in any way distinguished between whether or not the jury rendered a defense verdict because they believe she was more than 50% installed or with children. Yes, it was a verdict form where percents could be allocated. So I think there would have been a contributory claim. The jury also didn't hear anything about how my clients had to put up a spotlight or how they had to do anything, and there was no testimony about post, no testimony about that they should have done things differently under the law. And the fact is no post was violated. The steps were just like other steps down the street, other steps in the community, other steps everywhere in Southern Illinois. And, in fact, that's what my expert was prepared to testify to, but those opinions were barred. What the jury did hear was that a 217-pound woman with preexisting health problems fell while walking down the exact same steps she just walked up. And the appendix in the athlete's brief has several pictures just to give you a better idea of what I'm talking about here. This first one is the sidewalk. There are two sections of sidewalk. That's the City of Baltimore's sidewalk, and then there's a red step, and then there's an area where you walk into the building. The next picture, just for your reference, has a tape measure in it that shows that the red step is 10 inches wide. You can see the texture in it. You can see the contrast of the color between the red step and the next step. And then this third picture here has dimensions. It shows that this sidewalk is 71 inches wide, for instance, and then there's a 2-1⁄2-inch step to a 10-inch wide step, and then another 6-inch step to this 34-inch distance. And that gives you an idea that the plaintiff had almost 3 feet of space when she walked out the door. It's not a situation where it's a traffic of the unwary, and she opens the door, and she falls. She opens the door, lights shooting out in the restaurant. She's got 3 feet of space where she can walk. She said to the jury she had time to look to see where she was going. She could have seen what she just encountered. There was no handrail for the 8-1⁄2, and you can tell from these measurements, it's an 8-1⁄2-inch distance. There was no handrail. There was also no handrail at the jury box. The jury may have noticed that. There was no handrail at the witness stand. I don't think there's a handrail right over here. There was no handrail at the Beckman Institute. Okay, let me ask a question about the picture of the Beckman Institute. What questions did you ask the expert about the picture, just in general? Here's what I want to ask. If he had nothing to do with the design of it or any control over whether there was or was not a handrail at the Beckman Institute, how is that impeaching to his testimony? Your Honor, the testimony was that it's good practice from a human factors standpoint to have a handrail. That was the opinion that Dr. Kramer gave, and he testified that he had been a professor at the Advanced Institute of Technology and Science at the University of Illinois for four years and he was in fact the director of the institution. The significance of it is, and Judge? I mean, if the only evidence is that you show the picture and he works there and there's no handrail, how is that impeaching as to him if he had no control over it? I mean, maybe we'd like to have a handrail down here, but maybe we don't have any control over it. Yes, sir. Thanks for the question, Judge Stewart. This photograph shows the open house sign over the steps here. It shows Beckman Institute on the left-hand side. You can see a boy walking up six steps and you can see two different adults. The value of that impeachment comes from case law that says, Circumstances resting within the witness's knowledge may be developed on cross-examination that discredit or destroy the witness's direct testimony. So that is why it's very significant because the circumstances surrounding his occupation, the very building where he works, these are circumstances within the witness's knowledge. These are circumstances that I developed on cross-examination, and it's because it gave the jury reason to doubt his sincerity, the soundness of his opinion, and that the plaintiff's fault had anything at all to do with the handrail. Let me just stop you there, though. How does the fact that he works at a building that doesn't have a handrail, in the absence of any testimony that he has any control over that, how does that go to his sincerity, the strength of his opinion, whatever? I mean, I understand it if the questioning is, aren't you the guy in charge of this building? Couldn't you put up a handrail if you wanted to? And you didn't. Here's the picture. I understand that perfectly. Yes, sir. You know, if you work at the Sears Tower in Chicago and there's no handrail and there's, you know, hundreds and hundreds of offices, I mean, how can that somehow weigh negatively against you just because you happen to be a human factors expert and you work on the 100th floor? Well, it weighs against him because his own advice is not followed at the Human Factors Institute, and it weighs against him because it allows everybody. Was there testimony that he advised them to put one up? No, Your Honor. Then how does showing the picture show that his advice was not followed there? And, Judge, I'd like to back up and say that this is another issue that's evaluated under the abuse of discretion standard. Yeah, I understand. I think the trial judge had the opportunity to give due consideration to this and give due consideration to the probative value, the impeachment value versus the undue, the potential prejudice. And I'll point out, any potential prejudice was undone because the professor was allowed to testify about the other entrances. The professor was allowed to say, this is not the only entrance. I think it's pages 22 and 23 of the brief that set out. Well, you can move on with your argument. I'd like to answer your question, Your Honor. The court ultimately allowed the following question to be presented to the jury. This was the plaintiff's attempt at rehabilitation. Dr. Kramer, with regard to the Beckman Institute, does the University of Illinois provide for members of the public a handicapped accessible entrance to the Beckman Institute? And the answer was, it does indeed. So the point that I'm making in answering your question, Your Honor, is that any problem that there was, first, is evaluated under the abuse of discretion standard. And second, any problem that was incurred by that testimony where the good professor was able to convey to the jury, we've got handicapped accessible entrances. I think I was going to tell you about where the light was coming from in this case. Light hit the step from several different sources. There were two different street lights. And you can tell in some of the pictures that there is a shadow that's passed from the light and the light hits the step at issue. There's also testimony about a four-by-six gigantic neon sign over the door that casts light down. And you can see in the pictures that there are large windows. You can even see light emanating from the windows in a crisscross pattern that's in windows. You can see that being passed out. You can tell from looking at the pictures, and the testimony supports this, light was coming from several different sources. Even the photographer admitted, yes, you could see light, even in these pictures that I took. At night, you can see the light on the step reflecting from the step. The lamp's expert conceded the same thing. So the big issue is whether the verdict was arbitrary or unreasonable. And since the verdict was based on the evidence, the court did not err in denying the motion for a new trial. The next issue I'd like to address is the instruction issue. The plaintiff takes the position that the court should have given the missing witness instruction, even though the witness's testimony was barred. And, again, this is evaluated under the abuse of discretion standard. In fact, the Supreme Court has said the standard for reversing a judgment based on failure to permit an instruction is high. The plaintiff's counsel took the position there's a right-line rule. There's no right-line rule. There's a very high bar that the party that thinks an instruction should have been given has to meet. The court also says it's evaluated under a sound discretion standard. And the appellate court even says that parties do not have to produce every expert in order to avoid the unfavorable inference. What happened in this case was the defendants had disclosed an expert who was expected to testify. No code was violated. These steps are found in other locations in this case. That was literally barred on the eve of the crime. And, Judge Fulmer, I think you were asking about the timing of everything. The statements that the attorneys gave of who's going to testify, those were prepared before this ruling. I wrote down I expect him to testify before his opinion was barred. And I do not think that I referred to him in opening statement. The record would clarify that. Was the ruling made before jury selection started? Yes, Your Honor. And you didn't remove his name from the list? Your Honor, I didn't ask for the list back. I didn't ask for it to be redacted. I had already submitted that. Well, you were sitting in the courtroom when they read the name. And at that point in time, you knew you weren't going to call him. Judge, I cannot agree with that. And I don't know how far the court wants to get into this, but I can't tell you exactly when in my mind I determined not to call the witness. Well, the reason you gave for not calling him in your brief is the defendant would have called Mr. Lunsford as a witness, but for the existing circumstances that the anticipated highly favorable testimony was barred. And you knew that at the time that the name was read to the jurors. Well, I can tell you that he would have been called if his testimony had not been barred. But I cannot tell you that a decision was made. I cannot pinpoint when I made the decision not to do it. A trial is a very fluid thing. But you didn't know it was barred until – I mean, you knew it was barred prior to the jury selection. Yes, sir. I knew it was barred. And I want to back up a little bit to the case law because I think we're getting past the premise of this entire analysis. The Taylor v. Colley case is the one that's cited by the plaintiff. And it says the parties to this appeal both begin with the premise that an expert may be formally abandoned, after which time his opinion is no longer attributable to the party who originally disclosed him. That's not what we have here. That premise is not applicable here. When an expert is abandoned, it's because, as the plaintiff's counsel said, he's got a warrant on him or he's got something that the counsel wants to distance himself from the expert. And when counsel makes that decision to distance himself from an expert, they have to give notice. I never made that decision. I had no reason to distance myself from him. In fact, it was the judge's ruling, the motion in limine ruling, that kept me from calling him as a witness. There was absolutely no reason for me to abandon him. The logic is just not applicable here at all. The purpose of the instruction is to counteract the party's willful withholding of evidence. And the comments to the jury instruction even say that the presumption depends on the lack of a reasonable excuse for non-production or the willful withholding of evidence. And that's what's important, the reasonable excuse for non-production. I had a very reasonable excuse for not putting him on the stand because the plaintiff's motion in limine precluded the testimony that I wanted to solicit. The plaintiff can't bar an expert and then ask the jury to infer that since he was barred, since he's not testifying, infer that his testimony would have been harmful to me. That's inconsistent with reality. It's inconsistent with the purpose for the jury instruction. And again, it's evaluated under the use of discretion standard. It's a very high standard that the plaintiff cannot meet in this case. The next issue I'd like to look at, the plaintiff says that he should have been allowed to exceed the scope of direct examination of the defendant's expert surveyor. The defendant's called Mr. Grunlow as a witness to testify about the survey of the property. The entire reason for his testimony was who owns this estate? Who owns the property? And I should point out, Your Honor, and I apologize that the caption in this case is not accurate. I followed suit with what the plaintiff did to not confuse the court, but there was a third-party defendant. The city of Baltimore was a third-party defendant. The city is not a party to this appeal. But I want to point that out to you, and it explains why Mr. Grunlow was called. That was the entire purpose of why he was called. The plaintiff claims it was error because he wasn't allowed to ask Mr. Grunlow questions entirely outside the scope of direct examination, and that's fundamental to law. I think there's some clerks or law students sitting in the back that probably have learned that already. The case law is very clear that cross-examination is limited to the scope of direct examination. So I guess there was an issue about whether she fell on the city property, or is that what was going on? Yes, Your Honor, that was the issue. The nutshell of it is there was a survey done, and then there's a line essentially going through the step. That was the reason for his testimony. The court did not use its discretion in limiting the scope to the issue that was raised on direct examination. I think I've already covered a couple of the other issues. The next one I'd like to address is that the plaintiff contends that his experts should not have been cross-examined about inconsistencies of his opinion. This is the Canada Mortgage and Housing Corporation question, where I asked Professor Cramer a question. And on direct examination, the Plaintiff's Council laid the foundation for Dr. Cramer's reliance on different publications. One of those, the very first one listed, in fact, is the Canada Mortgage and Housing Corporation. Is it the same article? Yes, sir. Okay, so you were cross-examining on the same article that was listed? Yes, Your Honor. Okay. It wasn't like some other publication five years later or anything? No, Your Honor. Okay. I don't have the name. I think it's How to Prevent Faults was the name of the article. But it's within the Canada Mortgage and Housing Corporation. And on his CV, he listed a website where the exact article was located that he was referring to. So I read that article and asked him some questions about it. He opined that the Plaintiff's lack of knowledge of the area contributed to her fall. Testified that the publications he relied on were scientifically valid and were relied on by others in the field. So the Plaintiff laid the foundation for his testimony. And then this questioning, I won't read it, but it's on pages 22 and 23 of the brief of my question and answer to Professor Cramer. Essentially, he was asked whether he agreed or disagreed with the statement that I read from that article that he relied on. Should I finish my card? Sure. He told me that he needed more data to explain whether people fall on facts that they are familiar with or whether people fall on steps they are not familiar with. He couldn't give me a yes or no, whether he agreed or disagreed, that what he told the jury was exactly the opposite of what was stated in the source that he relied on. Thank you, Your Honor, for letting me finish my thought. The trial court should be affirmed. Rebuttal, counsel. Thank you, Your Honor. With regard to Mr. Lunsford, he was presented by the defendants as an expert witness who was prepared to say, I've gone to that location. I've looked at the entrance to Joe's Pizza. There isn't anything wrong with regard to the steps. There isn't anything wrong that there was no handrail. There isn't anything wrong with regard to the amount of lighting there. The judge properly struck two bases, but everything else remained with regard to his testimony. As the Taylor v. Coley case says, the goal is that a party, me, my client, will be able to rely on his adversary's expressed intention to call the experts he discloses. Now, here's where the warts come in. This witness admitted that he has designed steps and stairways and has done so with regard to renovation projects just like this one. In his deposition, I got him to admit, when you design those, you design the risers, the steps of even height. And why do you do that? Because it's a safety issue. People are expecting, as Dr. Kramer said, that when you approach steps or stairs, there's going to be an even rise. When they're uneven, that causes people to trip. It causes them to lose their balance. So he was vulnerable in that respect. He was vulnerable with regard to the adequacy of the lighting because I found out, through his discovery deposition, that he had been an adversary on another case that the defense firm had been involved in. And he had been hired to determine the adequacy of some steps and lighting at an apartment building in Carbondale. And it was my expectation, he talked about using a light meter and being able to read the lumens and determining whether or not there's enough lighting or not. There was clearly no lighting. This Mary Ann Oldfield, when she came out of that restaurant, she was walking out into darkness. He was vulnerable, very vulnerable, on that part of his testimony as well. He didn't do any light measurements. He didn't, you know, because he knew that had he done the light measurements, it would have shown that the amount of light at this restaurant was less than the amount of light that he said was inadequate on those steps down in Carbondale. Now, whether the strategy was decided, we're not going to call him because I've already worked over a plaintiff's expert. For whatever the reason, it's immaterial. Once that witness is put front and center and put on the witness list and boardeered and we go through trial and the plaintiff puts on his whole case and with the expectation that when the defendant's case is going in that that witness is going to be called and then the shock, the defendant rests never having called that expert witness. In that instance, the Illinois Supreme Court has said, it is not optional. With regard to the issue of the unreasonableness of the jury verdict, as the defendants admitted, they expected, they wanted customers of all ages, abilities, and infirmities to go into their restaurant, and yet they knew that they had an entrance or should have known that was inadequate and dangerous, a hazard for people such as Mrs. Oldfield. You take the plaintiff and you find them. She wasn't a track athlete, but she was someone they clearly knew would be coming to the restaurant, and when you look at the photographs and you see the darkness and you wouldn't be able to see or barely see even the outline of the step, the dangers that are associated with that, this restaurant had only been open five weeks. It was a situation where it is against the manifest way of the evidence for this jury to say, 100% of the fault is Mary Ann Oldfield. The primary fault, primary responsibility lies here with the defendant's negligence with regard to the entrance that they provided for the public. Thank you. Thank you, gentlemen, today for your arguments and your briefs. We'll take them at our advisement.